COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Humphreys and Alston
Argued at Richmond, Virginia


TERRY M. TATE

                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 2700-08-2                       JUDGE LARRY G. ELDER
                                                    SEPTEMBER 29, 2009
SHARON E. TATE


                  FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
                         Paul M. Peatross, Jr., Judge Designate

          Francis L. Buck (Buck, Toscano & Tereskerz, Ltd., on briefs), for
          appellant.

          Christopher J. Smith (Christopher Schroeck; Law Offices of
          Christopher J. Smith, PLC, on brief), for appellee.


       Terry M. Tate (husband) appeals from a final decree granting a divorce to his former wife

Sharon E. Tate (wife).  He contends the trial court erred when it imputed income to him in its

award of spousal support to wife.  Because the evidence supports the trial court's finding that

husband's familial relationship with his employer, his mother, unduly influenced her decision to

sell the salvage yard where he worked, we affirm the ruling of the trial court.

                                                I.

                                           BACKGROUND

       On appeal, we view the evidence and all reasonable inferences therefrom in the light

most favorable to the prevailing party below.  Alphin v. Alphin, 15 Va. App. 395, 399, 424

S.E.2d 572, 574 (1992).  Thus, a trial court's judgment will not be disturbed on appeal unless

plainly wrong or without evidence to support it.  Jennings v. Jennings, 12 Va. App. 1187, 1189,

       [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

409 S.E.2d 8, 10 (1991).  So viewed, the evidence establishes the parties were married in 1976.

In 1992, husband began working full-time at S.L. Tate Sales and Service, a salvage yard owned by his parents, Sidney and Augusta Tate (Ms. Tate).  The salvage yard acquired wrecked and abandoned automobiles, which were cannibalized for parts that they sold to their customers.  Periodically, they sold the inventory of automobiles for scrap metal.  The salvage yard was incorporated in Virginia, and husband's parents were its owners.  Husband worked at the salvage yard as a treasurer where he handled the company's financial matters.  Upon Sidney Tate's death, Ms. Tate took the property as sole owner and did not convey any interest to husband.

As part of his responsibilities, husband "took care of the whole yard," whereas Ms. Tate "didn't have much involvement in the day-to-day [operations]" of the business.  Despite Ms. Tate's status as sole owner of the salvage yard, her responsibilities with the salvage yard were limited to answering the phone.  Husband did not receive a fixed salary for his work.  Instead, he would write checks as needed to cover his living expenses and deposited them into a personal checking account.  Husband did not consistently record these withdrawals.  Ms. Tate also gave him proceeds from car crushing operations totaling $10,000 to $15,000.  Wife was employed as an animal control officer for Albemarle County where she earned an annual income of approximately $40,000.

The parties began experiencing marital difficulties in 2001, and husband moved out of the marital residence.  The parties reconciled two months later and resumed cohabitation, but the relationship remained strained.  Husband permanently left the marital residence in July 2005 after his youngest son's high school graduation.  He moved to a trailer on property within the salvage yard, where he currently resides.

In 2005, Ms. Tate began the process of closing down the salvage yard.  Husband testified that he initiated the discussion of whether to sell the salvage yard with his mother because he

was tired of working at the salvage yard due to the long hours and low pay. Ms. Tate agreed to sell the salvage yard because it reminded her of her late husband, Sidney. Husband further acknowledged that prior to 2005, his mother was "[n]ever really serious about [selling] until a few weeks until we actually sold [the property]." Husband assumed responsibility for winding up the business by cleaning the property and selling the remaining inventory. Ms. Tate did not participate in the winding up.

On May 12, 2006, Ms. Tate closed on the sale of the land where the salvage yard was located for approximately $1.5 million. After paying off debts and capital gains taxes, she gifted approximately $264,000 of the proceeds to husband in the form of two separate gifts of $140,000 in 2006 and $124,000 in 2007. Husband testified that he used this money to pay off existing debts and make personal expenditures so that none of the money remained by the time of the divorce proceedings.

At the time of the divorce proceedings, husband was employed as a school bus driver for Albemarle County and received an annual salary of $16,356 plus health benefits. He testified that he did not actively seek higher-paying employment because his health plan with the school district helped pay his mounting medical bills associated with the treatment of his diabetes. Ms. Tate confirmed that she did not plan to give husband further monetary gifts from the proceeds of the sale of the salvage yard.

Husband further testified that it was nearly impossible to open a salvage yard similar to the one he operated with his mother because recent zoning ordinances and federal restrictions limited the operation of new salvage yards that did not qualify under the grandfather clause. He testified that in order to obtain employment in an existing salvage yard, he would have to accept a wage of $10 an hour as a laborer. However, husband admitted that he never actually inquired into obtaining employment.

On October 17, 2006, wife filed for divorce on the grounds of desertion and requested spousal support. In his answer, husband denied wife's allegations and sought a divorce on the grounds of separation exceeding one year. In hearings regarding the parties' finances, wife argued that income should be imputed to husband based on his voluntary departure from his work at the salvage yard and the monetary gifts he received from Ms. Tate.

On October 20, 2008, the trial court entered a final decree of divorce on the ground of separation exceeding one year and equitably distributed the marital assets and debts of the parties pursuant to Code § 20-107.3. The trial court further awarded wife spousal support, finding that "she [was] free from legal fault and has demonstrated a need for support." In regard to husband's ability to pay support, the trial court imputed a gross annual salary of $66,000 to husband, finding that "he walked away [from his employment] voluntarily and did not work after closing the business when he was receiving the monetary gifts from his mother." The trial court based this amount on deposits husband made to his account in 2004, reasoning that the deposits in 2005 reflected proceeds from winding up the sale of the salvage yard and did not give an accurate measure of husband's yearly earnings. In addition, the trial court explicitly held that the imputation was not based on gifts received from his mother as a result of the sale of the salvage yard. Upon these findings, the trial court required husband to pay wife $1,200 per month in spousal support.

## II.

## ANALYSIS

## A.

## IMPUTATION OF INCOME

On appeal, husband contends that the trial court incorrectly imputed to him income derived from his past employment at Ms. Tate's salvage yard because he was involuntarily

underemployed. The proper measure for imputing income, husband avers, is whether the evidence adequately substantiates the existence of current employment opportunities that the spouse is forgoing. Husband argues that it is improper to impute $66,000 to him under this test because his prior employment was the result of a favored position with his mother that no longer exists and cannot be replicated. Because he cannot open a comparable salvage yard that will generate similar income, husband asserts that his good faith decision to retain his employment as a school bus driver bars imputation to him of his 2004 earnings.

In opposition, wife argues the obligee spouse need not prove better-paying positions are currently available to the obligor spouse if the spouse seeking imputation proves the obligor voluntarily left his previous employment. Wife contends that husband voluntarily left his employment by convincing his mother to sell the salvage yard and, thus, that she was not required to prove husband was capable of finding higher-paying work elsewhere or operating his own salvage yard.

When calculating the amount of spousal support to be awarded, the court may "impute income to a party" who "choose[s] a low paying position that penalizes the other spouse." Srinivasan v. Srinivasan, 10 Va. App. 728, 734, 396 S.E.2d 675, 679 (1990); see Code § 20-107.1(E)(9) (requiring the court to consider the "earning capacity, including the skills, education and training of the parties and the present employment opportunities for persons possessing such earning capacity" in computing the amount of spousal support); Stubblebine v. Stubblebine, 22 Va. App. 703, 708, 473 S.E.2d 72, 74 (1996) (en banc) ("A reduction in income resulting from a voluntary employment decision does not require a corresponding reduction in the payor spouse's support obligations, even if the decision was reasonable and made in good faith."). "The burden is on the party seeking the imputation to prove that the other [party] was voluntarily foregoing more gainful employment, either by producing evidence of a higher-paying

former job or by showing that more lucrative work was currently unavailable." Niemiec v. Commonwealth ex rel. Niemiec, 27 Va. App. 446, 451, 499 S.E.2d 576, 579 (1998). "Whether a person is voluntarily unemployed or underemployed is a factual determination." Blackburn v. Michael, 30 Va. App. 95, 102, 515 S.E.2d 780, 784 (1999). We therefore will not reverse a trial court's decision regarding spousal support unless it abuses its discretion. See Miller v. Cox, 44 Va. App. 674, 679, 607 S.E.2d 126, 128 (2005).

When a complaining spouse asks for income to be imputed to the other party, the first inquiry the trial court must make is whether the obligor spouse has voluntarily left his or her employment. See Reece v. Reece, 22 Va. App. 368, 375-76, 470 S.E.2d 148, 152 (1996) (distinguishing the imputation analysis where the "supporting spouse *voluntarily* chose to leave his existing job to pursue other employment" from the situation where the spouse, "through no fault of his own, became involuntarily unemployed when his employer eliminated his position" (citing Antonelli v. Antonelli, 242 Va. 152, 156, 409 S.E.2d 117, 119-20 (1991))); see also Niemiec, 27 Va. App. at 452, 499 S.E.2d at 579-80 (inquiring into the mother's decision to leave her previous job before looking into her current earning potential). If so, the inquiry ends and the "trial court may impute income based on evidence of recent past earnings." Brody v. Brody, 16 Va. App. 647, 651, 432 S.E.2d 20, 22 (1993) (requiring the father to "produce evidence that was sufficient to 'enable the trial judge reasonably to project what amount could be anticipated' had the mother continued in her employment" (quoting Hur v. Dep't of Soc. Servs., 13 Va. App. 54, 61, 409 S.E.2d 454, 459 (1991))). If, however, the obligor spouse's employment ended involuntarily or with the complaining party's consent prior to the divorce, the spouse seeking imputation must offer evidence of current employment opportunities that the other party is forgoing. See McKee v. McKee, 52 Va. App. 482, 491-92, 664 S.E.2d 505, 510 (2008) (en banc) (refusing to hold a stay-at-home spouse voluntarily unemployed immediately following a

divorce proceeding so that the complaining party must prove imputation through current employment opportunities); Payne v. Payne, 5 Va. App. 359, 364, 363 S.E.2d 428, 431 (1987) (noting that the wife approved and supported the husband's decision to leave his job to start his own business three years prior to the dissolution of the marriage). The issue we must first address is whether the trial court erred in finding that husband voluntarily ended his employment by convincing Ms. Tate to sell the salvage yard.

The unique facts in this case support the trial court's finding that husband had voluntarily left his employment at the salvage yard. Even though husband's employment ended as a result of Ms. Tate's decision to sell the salvage yard, the evidence supports the finding that husband engineered his own job loss because responsibility for the sale fell solely on him. Ms. Tate testified that while she retained sole ownership of the salvage yard, she participated minimally in the day-to-day operations. Despite husband's argument to the contrary, the evidence supports a finding that the idea to sell the salvage yard originated with him. Indeed, the trial court asked counsel for husband:

> THE COURT: Is that how the evidence came in? The evidence came in as [husband] got tired and didn't want to do it and went to his mother, and his mother agreed, right? Isn't that the way the evidence came in?
>
> [HUSBAND'S COUNSEL]: Sure.
>
> THE COURT: Okay. So it's his election. He says, mom, I'm tired. I don't want to do this anymore.

The trial court thus fully considered husband's influence as a factor in finding husband was voluntarily unemployed. The evidence supports the trial court's determination because the

unique business relationship between Ms. Tate and husband allowed him to exert enough influence on his mother to convince her to sell the salvage yard.[1]

Further, the record established that the decision to sell the salvage yard occurred around the time husband moved out of the marital residence. Husband has failed to produce evidence that wife approved of or supported this change. Even though husband testified that it was Ms. Tate's idea to sell the salvage yard, the trial court was not obligated to believe husband's self-serving testimony. See Hatloy v. Hatloy, 41 Va. App. 667, 673, 588 S.E.2d 389, 392 (2003). Even though Ms. Tate held the sole legal right to sell the salvage yard, the record supports the trial court's finding that husband voluntarily ended his employment by operation of his influence on his mother. Wife, therefore, is not required to show that husband is able to secure higher-paying employment under present circumstances. See Brody, 16 Va. App. at 650-51, 432 S.E.2d at 22 (holding that once "the father produced evidence that the mother chose to leave her job as a defense analyst," he did "not have [to prove] what employment [was] available to the mother").

Upon finding that husband voluntarily left his employment, the trial court was required to impute an accurate measure of income to husband based on his past earnings. See Brody, 16 Va. App. at 651, 432 S.E.2d at 22. Husband testified at trial that he made only $10,000 to $15,000 per year while working at the salvage yard. However, he also admitted to taking money

---

[1] We do not suggest that a spouse becomes a de facto operator of his place of employment simply because he expresses a desire to quit his job or has a close relationship with his supervisors. Cf. Reece, 22 Va. App. at 375, 470 S.E.2d at 152 (eschewing rigid application of bright line rules to the imputation analysis in favor of considering the facts of each specific case). Rather, we hold under the facts of this particular case the evidence supports a finding that Ms. Tate's decision to sell the salvage yard was born not of her independent judgment, but of husband's stated purpose to quit his job voluntarily because he was tired of it, as if he had made the decision to sell the salvage yard himself. See Antonelli, 242 Va. at 155, 409 S.E.2d at 119 (simplifying the definition of "voluntary act" to any willful act that results in a diminution of income, irrespective of good faith or future earning potential).

from the salvage yard as needed and depositing it into his personal account. Husband's numerous deposits, his expenditures beyond his alleged means, and the less-than-meticulous manner in which he managed the records of the salvage yard permitted the trial court to look to husband's bank statements to determine that husband actually earned closer to $66,000. The trial court took further efforts to obtain an accurate picture of husband's earnings by looking at his 2004 financial records rather than his 2005 bank statements because they contained deposits relating to husband's winding up business prior to closing the salvage yard.

We hold that the evidence was sufficient to support the trial court's decision to impute spousal support based on husband's 2004 deposits into his personal account, his various earnings from the salvage yard prior to receiving two one-time lump sum monetary gifts from Ms. Tate. Accordingly, we conclude the trial court did not abuse its discretion in its award of spousal support.

B.

ATTORNEY'S FEES

Wife seeks an award of attorney's fees incurred on appeal.

> The rationale for the appellate court being the proper forum to determine the propriety of an award of attorney's fees for efforts expended on appeal is clear. The appellate court has the opportunity to view the record in its entirety and determine whether the appeal is frivolous or whether other reasons exist for requiring additional payment.

O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996).

While ultimately erroneous, husband's argument appealing the imputation of income is "fairly debatable." See Brandau v. Brandau, 52 Va. App. 632, 642, 666 S.E.2d 532, 538 (2008). Wife does not contend husband's appeal is wholly meritless. We therefore deny wife's request for fees.

III.

CONCLUSION

Because the evidence was sufficient to prove that husband voluntarily left his employment by convincing his mother to sell the salvage yard where he worked, we hold the trial court did not err by imputing $66,000 income to him. However, because his argument on appeal was fairly debatable, we decline to award wife attorney's fees.

Affirmed.